| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>       Plaintiff,<br><br>       v.<br><br>DRIVEN FENCE, INC.,<br><br>       Defendant. | No. 17 CV 6817<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

The EEOC claims that Driven Fence, Inc. violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), when it allegedly subjected an employee to a hostile work environment based on his race and constructively discharged him. Driven Fence now moves for summary judgment, arguing that there is no basis for employer liability and that the employee was not constructively discharged. For the reasons explained below, the motion is denied.

**I.    Legal Standards**

Summary judgment is appropriate if Driven Fence shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). There is a genuine dispute over a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As the movant, Driven Fence bears the burden of establishing that the summary judgment standard is met, but the EEOC must provide evidence to establish every element of its claim

for which it will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). I construe the facts in the light most favorable to the EEOC and draw reasonable inferences from them in its favor. *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018).

## II. Facts

Arri Samuels began working for Driven Fence, a fencing company, in May 2016. [43] ¶¶ 21–22.[1] Samuels is black. [42] at 1. Before he started, Samuels met with Joelle Masterson, the vice president responsible for hiring. [43] ¶¶ 11, 13. Masterson told Samuels that if he had any problems or questions, he should talk to Gary Montino, the warehouse supervisor. [43] ¶¶ 15, 70. Masterson also gave Samuels a copy of Driven Fence's "Rules and Regulations," which included that co-workers must treat each other with respect and that "[b]ullying behavior toward anyone is unacceptable and will not be tolerated." [43] ¶¶ 17–18. The document instructs that "[i]f for any reason you have a disagreement with a co-worker it should be brought to the managers attention to handle. If anyone treats another disrespectfully you will be brought in to see the HR manager and further action will be determined." [41-1] at 164–65; [43] ¶ 18. Montino understood himself to be the manager who was

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings. Facts are taken from the parties' responses to each other's Local Rule 56.1 statements of material facts, which include the original facts and the responses. [43]; [53]. Driven Fence submitted a reply to the EEOC's response to its statement of material facts, but the local rules do not allow for a reply, so I disregard it. *See* L.R. 56.1(a)(3); *Johnson v. Cty. of Cook*, No. 08 C 2139, 2012 WL 2905485, at *13 (N.D. Ill. July 16, 2012) ("[T]he rule permits movants to reply only to a Local Rule 56.1(b)(3)(C) statement, not to a Local Rule 56.1(b)(3)(B) response."). Driven Fence also exceeded the 80 facts it was allowed under the local rule without asking for leave to file them, but the extra facts are not material.

supposed to receive employee reports of co-worker disagreements, and he understood that he had the option to bring employees to Masterson when he saw fit. [53] ¶ 10. Montino believed that if someone reported racial harassment, it was something he would bring to Masterson's attention, [53] ¶ 11, and Masterson expected Montino to elevate employee issues to her. [43] ¶ 74.[2]

Not long after starting the job, Samuels faced several racially charged comments from his colleagues. For example, some of his co-workers called him "Pedro Negro." [43] ¶ 39. Samuels told Montino about the name-calling, but, according to Samuels, Montino laughed and he too called Samuels by the offensive nickname. [43] ¶¶ 42–43. Montino made a handful of other derogatory statements to Samuels— including seeing that Samuels was wounded and remarking, "wow, you even bleed black too;" telling Samuels about a time he told a previous black employee standing next to expensive machinery in a photo that it was going to look like he stole it; and saying, "[w]ow, there's another black man in the White House, what is this world coming to?" [43] ¶¶ 28, 33, 35. Another co-worker, a janitor, also once shouted "that's my n*****" at Samuels. [43] ¶ 30. Other than telling Montino that people called him

---

[2] Driven Fence tried to retract this fact in its reply, arguing that the fact is not supported by the testimony it cited, [54] ¶ 74, but I have disregarded the reply. The fact is supported by Masterson's testimony. *See* [41-2] at 28:12–29:8 (Masterson's testimony that she "100 percent" expected Montino to bring employee complaints to her attention and that she told Montino when he was hired that he should elevate to her "any complaint that is received by him from an employee that isn't his to handle"). Driven Fence relied on the fact in its opening brief. *See* [40] at 4 ("[Montino's] responsibilities do not include handling employee complaints as he is expected to elevate human resource complaints to Joelle Masterson."). And the EEOC's dispute with the fact was limited to the portion stating that "Montino's responsibility does not include handling employee complaints," not the portion that says "[Montino] is expected to elevate human resource complaints to Joelle Masterson." [43] ¶ 74.

3

"Pedro Negro," Samuels did not report the racial comments to anyone. [43] ¶¶ 29, 32, 34, 36.

The harassment reached a new level when Samuels entered the warehouse to see a noose hanging from a rafter. [43] ¶ 53. Two co-workers—Luigi and Tacho—stood on either side of Samuels as he walked towards it to get a better look. [43] ¶¶ 54–55. Samuels asked, "what do they need this for?" and Luigi responded, "if you don't do your work right, this is what's going to happen." [43] ¶ 57. Tacho said, "put your head in there," and Tacho and Luigi grabbed Samuels's arms, trying to put his head in the noose. [43] ¶¶ 58–59. Samuels was able to free himself from their grip. [43] ¶ 60. Samuels did not report the noose incident to anyone at Driven Fence, though Montino had walked past the noose at some point and laughed. [43] ¶ 63. Three weeks after the noose incident, Samuels quit. [43] ¶ 66.

## III. Analysis

The EEOC alleges two claims. First, that Driven Fence subjected Samuels to a hostile work environment and second, that it constructively discharged him. [1] ¶ 11(a), (b). Driven Fence argues that the EEOC has not proven that there is a basis for employer liability or that Samuels was constructively discharged. It does not contest any of the other elements of the hostile work environment claim.

Title VII applies to employers, not individuals, so the EEOC must prove that Driven Fence is liable for the discrimination that Samuels suffered. *See* 42 U.S.C. § 2000e-2(a)(1); *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). Whether an employer is liable for its employees' harassment depends on who the harassers were. If the harassers were Samuels' supervisors, then Driven

4

Fence is strictly liable for the harassment. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017). If the harassers were other, non-supervisory coworkers, then Driven Fence is liable if it was "negligent in discovering or remedying the harassment." *Id*. (quoting *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011)). The EEOC does not argue that Montino or any other alleged harasser was a "supervisor" under Title VII, [42] at 6, so the question is one of negligence.

Driven Fence was negligent "if it knew or should have known of the harassing conduct yet failed to act." *Nischan*, 865 F.3d at 931 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 799–800 (1998)). There is no dispute that Driven Fence did not timely act to end the harassment. Instead, Driven Fence argues that it couldn't have put an end to harassment that it did not have any idea about, since Samuels never told anyone who could have helped him (namely, Masterson). Usually, an employee must make a "concerted effort to inform the employer that a problem exists," like "lodging a complaint with human resources or telling high-level management about the harassment." *Id*. (quoting *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004)). Samuels didn't do those things, and the EEOC doesn't argue otherwise. But Driven Fence can still be negligent if it had constructive notice of the harassment. *Id*.

An employer has constructive notice of harassment when it "come[s] to the attention of someone who … has under the terms of his employment, … a duty to pass on the information to someone within the company who has the power to do something about it." *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997). "Once

5

that person learns of the [ ] harassment, the employer is considered to be on notice even if the victim never reported the harassment." *Nischan*, 865 F.3d at 931. The EEOC contends that Montino is the conduit of constructive notice here—he certainly had notice of the harassment since he participated in much of it and, the EEOC argues, Montino was duty-bound to pass the information on to Masterson, who could have stopped it. Driven Fence says that Montino didn't have a duty to report harassment.

In *Nischan*, the plaintiff alleged that she had been sexually harassed by a co-worker. 865 F.3d at 926. The employer had a policy providing that "any employee with managerial or supervisory responsibility who witnesses or is otherwise aware of possible harassment ... must report the conduct immediately to that employee's supervisor/manager, the V.P. of Human Resources or Employee Relations Manager or the Chief Operating Officer." *Id*. at 932. There was evidence that two managerial or supervisory employees once witnessed the harassment of the plaintiff. *Id*. As a result, those co-workers' knowledge of the harassment was sufficient to establish the employer's constructive notice. *Id*. at 933.

Although not as clear as the supervisors' obligation in *Nischan*, a reasonable jury could conclude that Montino had a "duty" to report harassment to Masterson. Driven Fence's "Rules and Regulations" informed employees that "a disagreement with a co-worker … should be brought to the manager[']s attention to handle" and that "if anyone treat[ed] another disrespectfully" they would be "brought in to see the HR manager." [43] ¶ 18. Under that policy, Montino was the "manager" who Samuels

6

was supposed to report "disagreements" to, and Masterson was the HR manager who was to see anyone treating co-workers disrespectfully. Samuels's harassment was brought to Montino's attention, since he knew about the name-calling, participated in it, and knew about the noose. And though the policy's next line is worded passively, a reasonable inference is that Montino was the person responsible for bringing disrespectful employees to Masterson. This interpretation of the policy is also supported by Montino's and Masterson's testimony. Montino agreed that he had the "option" to forward complaints to Masterson, [53] ¶ 10, and admitted that that is what he "would" do. [53] ¶ 11. And Masterson testified that she "100 percent" expected Montino to elevate employee issues to her. [41-2] at 28:12–24. A jury could find that under these rules and expectations, Montino was required to bring disrespectful employees, including himself, to Masterson's attention, and as a result, that Driven Fence was on constructive notice of the harassment of Samuels.

This is not a necessary conclusion. The rules are not as precise as the policy in *Nischan*, and there is no evidence that the Driven Fence trained Montino on what to do if he learned of racial harassment. A jury could conclude that Montino was not required to report on himself. *See Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1037 (7th Cir. 1998) ("Obviously, it is unreasonable to expect that Strong would transmit complaints about himself to Civil Constructors' management."). But because a jury could conclude either way, summary judgment is inappropriate.

The EEOC also argues that Driven Fence's ineffective anti-harassment policy demonstrates its lack of care. But Driven Fence's meager anti-harassment policy does

7

not, standing alone, support a finding of negligence. A negligent employer must have notice of at least a probability of harassment, whether the employer has a good, bad, or nonexistent anti-harassment policy. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 391 (7th Cir. 2010) (describing the notice requirement as "part of" a showing that the employer "failed to have and enforce a reasonable policy for preventing harassment" (citation omitted)); *Erickson v. Wisconsin Dep't of Corr.*, 469 F.3d 600, 606 (7th Cir. 2006) ("Before liability for sexual harassment can arise, the employee must give 'the employer enough information to make a reasonable employer think that there was some probability that she was being sexually harassed.'" (quoting *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir.1996)). But here, where there is evidence that could support a finding of constructive notice along with a policy that, viewed in the EEOC's favor, fails to address head-on the prospect of protected-status harassment, an inference of negligence is reasonable.

Constructive discharge requires a plaintiff to show that "the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004). The EEOC must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation

before it causes the employee to quit." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citation omitted).[3]

I agree with the EEOC that the harassment Samuels suffered—particularly the noose incident—was egregious. *See Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) ("[R]epeated use of a noose—perhaps the ultimate symbol of racial hatred and hate crimes—combined with implied threats of physical violence … clearly qualifies as egregious for purposes of constructive discharge."). Samuels did not report the harassment he suffered to Masterson, and the law does not hold employers responsible for failing to correct discrimination when they have had no opportunity to do so. *See Porter*, 576 F.3d at 639–40. But as discussed above, there is evidence to support an inference that Driven Fence was on constructive notice of the noose incident—Montino knew about it and was obligated to bring it to Masterson's attention. Whether Driven Fence had an opportunity to correct the discrimination is disputed, and so its motion for summary judgment is denied.

## IV.    Conclusion

Driven Fence's motion for summary judgment [39] is denied. A status hearing is set for August 29, 2019, at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date: August 2, 2019

---

[3] The EEOC does not argue the other kind of constructive discharge, where "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Chapin*, 621 F.3d at 679.

9